# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2275

_____

American Guarantee and Liability     *
Insurance Company,     *
    *
       Appellant,     *
    *   Appeal from the United States
      v.     *   District Court for the
    *   Eastern District of Missouri.
United States Fidelity & Guaranty     *
Company; TIG Insurance Company,     *
    *
       Appellees.     *

_____

Submitted: April 14, 2011
Filed: February 10, 2012

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

This is a dispute between an excess and primary insurer, both of whom insured a trucking company whose tractor trailer was involved in a fatal traffic accident. Parties injured in the accident sued the trucking company and obtained a jury verdict which exposed the excess carrier to a seventeen million dollar liability. The excess carrier, American Guarantee and Liability Insurance Company (hereinafter Zurich), sued the primary carrier, United States Fidelity & Guaranty Company (USF&G), alleging bad faith in failing to settle the underlying claim within the policy limits. Just a few months before Zurich's suit, USF&G had itself filed a declaratory judgment

action asking the court to declare it owed no obligation to Zurich. After the two suits were consolidated, the district court[1] granted USF&G's motion for summary judgment. Zurich appeals. We affirm.

I

On May 18, 2002, heavy fog stopped traffic in the westbound lane of Interstate 44 near Joplin, Missouri, resulting in an eleven-vehicle pileup. One of the vehicles involved in the pileup was occupied by Jose Silva and his wife, Ana. The Silva vehicle rear-ended a semi tractor trailer before being hit from behind by another vehicle. Several other vehicles, including a semi tractor trailer operated by Consolidated Freightways, Inc. (CF), then crashed into the disabled vehicles and caused a severe fire. Ana Silva burned to death inside her car. Jose Silva suffered second- and third-degree burns over ninety percent of his body. He was found in the median after crawling out of his car. He survived thirty-seven days before dying. Ana and Jose's parents brought wrongful death suits in the Circuit Court of St. Louis City against CF and others for the injuries resulting from the accident.

USF&G insured CF under a primary policy with limits of five million dollars. The USF&G policy was a fronting policy.[2] In addition to USF&G's policy, CF

_____

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

[2]Fronting policies are policies in which the insured's deductible is equal to the policy limits, Terra Indus., Inc. v. Nat'l Union Fire Ins. Co., 383 F.3d 754, 756 (8th Cir. 2004), essentially meaning the insured is self-insured. Such policies are frequently used by trucking companies to remain self-insured while still complying with the financial responsibility laws of the states in which they operate. A fronting policy protects the public in the event the self-insured entity becomes insolvent. In this case, CF agreed to indemnify USF&G in the event the latter paid any amounts payable under the policy. CF secured its indemnity obligation with eighty-seven million dollars in collateral which could be drawn upon in the event CF became insolvent or bankrupt, which is what occurred.

carried two levels of excess insurance. The first layer of excess insurance was a policy from a CF affiliate with three million dollars in coverage. The second layer of excess insurance was a policy issued by Zurich with fifty million dollars in coverage.

In September 2002, CF filed for bankruptcy for reasons unrelated to the Silva lawsuits. The automatic stay was lifted as to the Silva lawsuits on the condition any recovery from CF would be limited to available insurance coverage. CF later dissolved in December 2004. Prior to CF's dissolution, the bankruptcy court approved the transfer of CF's remaining assets to the CF Trust. The CF Trust was directed to "take such actions that are necessary or useful to maximize the value of the Trust," "[m]anage and protect the Trust property;" and "[s]ettle, compromise or adjust . . . any Claims, disputes or controversies in favor of or against the Trust."

In April 2004, a global mediation was held in the Silva lawsuits. CF participated in the mediation through TIG Insurance Company (TIG), a California claims handling corporation which handled all CF claims on behalf of USF&G. The mediation resulted in all defendants settling except for CF and one other defendant for a total of $3.165 million. During the mediation, the Silva plaintiffs demanded five million dollars from CF alone for its part in the accident. CF countered with a $250,000 offer. The Silva plaintiffs rejected CF's offer. In late 2005, the Silva plaintiffs and the CF Trust (through TIG) had additional settlement discussions. The discussions were unsuccessful with the Silva plaintiffs still demanding five million dollars and the CF Trust "willing to discuss a settlement . . . at a lower settlement figure."

In January 2006, the only other remaining non-settling defendant, Estes, settled with the Silva plaintiffs for $1.898 million. This brought the total settlement amounts the Silva plaintiffs had received from defendants other than CF to nearly $5.1 million. This meant the Silva plaintiffs would have to recover a verdict exceeding $5.1 million to recover anything from the CF Trust, a verdict exceeding $10.1 million to exhaust

the USF&G fronting policy, and a verdict exceeding $13.1 million to recover anything from Zurich (because the first layer of excess insurance was three million dollars through the CF affiliate). None of the insurers, claims managers, or defense attorneys involved in the Silva lawsuits estimated CF's exposure to be more than $13.1 million, and all believed the risk of a jury finding CF responsible for more than $13.1 million was very low to nonexistent.

Zurich was first notified of the Silva lawsuits in January 2006. Like the other claims managers involved in the Silva lawsuits, Zurich's claim handler did not believe the value of the remaining CF claim, when accounting for setoffs for the prior settlements, would expose Zurich to liability. Nevertheless, Zurich asked TIG to settle the remaining CF claim within USF&G's policy limits of five million dollars. But with $5.1 million in settlement proceeds from the other defendants, the Silva plaintiffs had little to risk by going to trial against CF.

Jury selection in the Silva lawsuits began in February 2006. TIG made one more attempt to settle on behalf of the CF Trust by offering $500,000. The Silva plaintiffs countered by demanding $4.75 million. Still believing the $4.75 million demand was more than CF's realistic exposure given its role in the accident, TIG and the CF Trust did not settle. Nor did the CF Trust ever ask TIG to settle within USF&G's policy limits. After the Silva trial began, TIG made one more attempt to settle by offering a "high-low" settlement offer. TIG guaranteed a low of $250,000 to the Silva plaintiffs even if there was a defense verdict, and a high of two million dollars in the event the Silva plaintiffs received a verdict from the jury in excess of two million dollars. The Silva plaintiffs rejected the "high-low" offer and reiterated their demand of $4.75 million.

At the conclusion of the Silva trial, the Silva plaintiffs asked the jury for an award of fifty million dollars. The jury returned verdicts totaling $46.06 million. With subsequent reductions by the trial court, adjustments for set-offs, and a further reduction negotiated by Zurich, the Silva plaintiffs eventually accepted a settlement

-4-

of twenty-two million dollars.  Of that amount, five million dollars was paid by the USF&G under its policy, and Zurich ultimately faced an exposure of seventeen million dollars.

In April 2006, USF&G filed a declaratory judgment action against Zurich in federal district court in Missouri.  USF&G claimed its payment of five million dollars terminated all of its obligations with respect to the Silva lawsuits.  In August 2006, Zurich filed an action against USF&G and its claim manager, TIG, in federal district court in the state of Washington alleging USF&G failed to settle the Silva plaintiffs' underlying wrongful death suits in bad faith.  Zurich sought seventeen million dollars in damages from USF&G.  Zurich (a New York corporation with its principal place of business in Illinois) chose Washington as the state to file its bad faith claim against USF&G (at the time a Maryland corporation with its principal place of business in Minnesota) and TIG (a California corporation with its principal place of business in Texas) because CF had operated its nationwide trucking company out of Washington before its dissolution in December 2004.

USF&G brought a motion to dismiss Zurich's suit in Washington, or in the alternative, a motion to transfer the Washington suit to Missouri where USF&G had first filed its declaratory judgment action.  Under the "first to file" rule, the Washington court agreed the dispute between the two insurance companies should be litigated in Missouri, concluding Zurich had not "demonstrated a stronger connection with Washington than Missouri." Am. Guarantee & Liab. Ins. Co. v. U. S. Fid. & Guar. Co., No. CO6-1254, 2006 WL 3499342 at *3 (W.D. Wash. Dec. 4, 2006).  The Washington court transferred Zurich's action to Missouri, where it was consolidated with USF&G's pending declaratory judgment action.

In the consolidated action, USF&G and TIG moved for summary judgment with respect to Zurich's bad faith failure-to-settle claim.  The district court made a preliminary determination about whether the summary judgment motion would be evaluated under Washington law as requested by Zurich, or under Missouri law as

requested by USF&G. The district court determined the dispute between the two insurers had more contacts with the state of Missouri than with the state of Washington, for the following reasons: (1) any injuries arising from the bad faith failure-to-settle claim did not occur in Washington because CF was dissolved in December 2004 and no longer existed when the Missouri jury rendered a verdict in favor of the Silvas in early 2006; (2) the conduct causing the injury occurred in Missouri where most of the settlement negotiations took place or should have taken place; (3) neither Zurich nor USF&G were incorporated in either Washington or Missouri; and (4) Missouri was the place where the relationship between the two insurers was centered because Missouri was where the underlying Silva litigation occurred. The court concluded by noting "Missouri has an interest in ensuring that the parties to litigation in its courts attempt to settle in good faith." Addendum at 13-14.

After determining Missouri law applied, the district court granted USF&G's motion for summary judgment. Am. Guarantee & Liab. Ins. Co. v. U.S. Fid. & Guar. Co., 693 F. Supp. 2d 1038, 1052 (E.D. Mo. 2010). The district court determined Missouri law does not allow an excess carrier to bring a bad faith failure-to-settle claim against a primary carrier – whether as an assignee of the mutual insured, under principles of subrogation, or under equitable principles – because the only party with the right to bring a bad faith failure-to-settle claim is the insured. Id. at 1048-51. Alternatively, the district court indicated a necessary element of a bad faith failure-to-settle claim is a demand by the insured for the primary carrier to settle the underlying litigation within the primary policy limits. The district court determined neither CF or the CF Trust requested USF&G to settle the Silva lawsuits within the policy limits, and thus there was no actionable claim for bad faith failure to settle. Id. at 1051-52.

Zurich filed a motion for reconsideration, which the district court denied. Zurich then filed a timely appeal. On appeal, Zurich contends the district court erred in applying Missouri law rather than Washington law. Zurich further argues the CF Trust's failure to make a demand for a settlement within the primary policy limits

-6-

does not defeat its bad faith claim, and in the alternative contends there is a genuine issue of fact as to whether a demand by the CF Trust was necessary under the circumstances of this case. Finally, Zurich contends it is entitled to bring an equitable subrogation claim against USF&G in its own name under Missouri law.

II

"We review the district court's grant of summary judgment de novo." Beckon, Inc. v. AMCO Ins. Co., 616 F.3d 812, 816 (8th Cir. 2010).

A

Zurich first contends the district court should have applied Washington law rather than Missouri law to its bad faith claim.[3] We apply Missouri's choice-of-law rules to determine which state's law should govern. See Brown v. Home Ins. Co., 176 F.3d 1102, 1105 (8th Cir. 1999) (indicating a federal court sitting in diversity applies the forum state's choice-of-law principles). Missouri follows the "most significant relationship" test from the Restatement (Second) of Conflicts of Laws § 145 for resolving choice-of-law questions in tort actions. Thompson by Thompson v. Crawford, 833 S.W.2d 868, 870 (Mo. 1992). Under Section 145, the factors to be considered are: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. Id. After a court identifies the type and number of contacts under Section 145, Missouri requires those contacts to be considered under the perspective of the choice-of-law principles set forth in

---

[3]The parties agree there is a conflict between Washington and Missouri law which necessitates a choice-of-law analysis. See Prudential Ins. Co. of Am. v. Kamrath, 475 F.3d 920, 924 (8th Cir. 2007) ("Before applying the forum state's choice-of-law rules . . . a trial court must first determine whether a conflict exists.").

Section 6(2) of the Restatement (Second) of Conflicts of Laws. Natalini v. Little, 185 S.W.3d 239, 251 (Mo. Ct. App. 2006).[4]

The first Section 145 factor is the place where the injury occurred. In order to determine whether this factor favors Washington or Missouri, we must identify both the injury and the place where it occurred. Identifying the injury is not difficult. The injury involved in a bad faith failure-to-settle claim is the economic harm suffered by the insured as a result of the excess verdict in the underlying suit. See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003) (discussing the harm arising from a bad faith failure-to-settle claim as the economic injury suffered by the insureds). In this case, the injury is the economic harm suffered by the insured, CF, as a result of the Silva verdict.

Identifying the place where the injury occurred in this case is more difficult. Although the excess verdict occurred in Missouri, the location of the verdict does not necessarily determine where the injury occurred. "Missouri choice of law rules dictate that the place where the act takes harmful effect or produces the result complained of is the more significant contact" in determining the location of the injury. Birnstill v. Home Sav. of Am., 907 F.2d 795, 797 (8th Cir. 1990). In Birnstill

_____

[4]The policy concerns to consider under Section 6(2) are:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).

we decided the place of injury was where the plaintiff "resided at each relevant time period[.]" Id. at 798. Other courts have also focused on the plaintiff's location as the place where an economic injury occurs because it is where "the economic impact" is "felt." Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc., 406 F. Supp. 2d 175, 201 (D. Conn. 2005) (applying the Restatement (Second) of Conflicts of Laws § 145); see also W. Am. Ins. Co. v. RLI Ins. Co., No. 07-0566-CV-W-ODS, 2008 WL 1820839, at *3 (W.D. Mo. Apr. 21, 2008) (concluding an insured's failure to settle a claim harms the insured's "financial interests where he resides").

Zurich argues the place where the insured, CF, felt the economic impact of the Silva excess verdict was in Washington, where CF operated its business prior to its dissolution. We agree the place where an insured feels the economic impact of an excess verdict is the place where an injury occurs for purposes of a Section 145 choice-of-law inquiry in a bad faith failure-to-settle case. We are less sure Washington is where CF was located or where the economic impact of this excess verdict was felt at the "relevant time period." Birnstill, 907 F.2d at 798. The injury occurred in 2006 when a Missouri jury rendered a verdict in favor of the Silvas. As the district court noted, CF was not located in Washington at that time, having dissolved in 2004. USF&G contends CF's dissolution meant the economic impact of the Silva verdict was "felt" in one of four places other than Washington: (1) in California where CF's bankruptcy proceedings were administered and the CF Trust was created; (2) in New York where the excess carrier, Zurich, was incorporated; (3) in Illinois where Zurich had its principal place of business; or (4) nationwide wherever any of CF's creditors were located.

Zurich argues the district court erred when it considered CF's dissolution in determining whether CF felt the economic impact of the Silva excess verdict in Washington. Zurich contends we have previously considered a bankrupt entity's former residence when conducting a choice-of-law analysis, citing In re Payless Cashways, 203 F.3d 1081 (8th Cir. 2000) and In re NWFX, Inc., 881 F.2d 530 (8th Cir. 1989). We are not persuaded Payless or NWFX guides our analysis here, or that

-9-

the district court erred in considering CF's dissolution in determining whether Washington was the place where the economic impact of the Silva verdict was felt.

Payless is distinguishable because it involved a contract dispute rather than a tort claim, and our choice-of-law analysis was conducted under Section 188 of the Restatement (Second) of Conflict of Laws rather than under Section 145. See Payless, 203 F.3d at 1084. The issue was which state's laws should govern an ongoing contract between Payless and Amtech which had been negotiated and signed prior to Payless filing bankruptcy, and which Amtech had already performed in large part prior to Payless's bankruptcy. Id. Thus, Payless's post-bankruptcy residence or location was irrelevant to which state's laws governed the contract dispute. Similarly, NWFX is distinguishable because it, too, involved a contract dispute rather than a tort claim. The choice-of-law analysis in NWFX involved an application of Arkansas's choice-of-law principles for multi-state contracts. NWFX, 881 F.2d at 536. The contractual arrangement between NWFX and Pyburn existed prior to NWFX filing bankruptcy. Id. at 532. Thus, NWFX's post-bankruptcy residence or location had no bearing on the choice-of-law analysis.

CF's dissolution makes it more difficult to determine the place where the economic effect of the injury occurred. Under the circumstances involved in this case, we believe the location of the injury is a less important factor in determining which state's laws should govern the dispute between Zurich and USF&G.

> Situations do arise . . . where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous or *when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue. . . .* Situations may also arise where the defendant had little, or no, reason to foresee that his act would result in injury in the particular state. Such lack of foreseeability on the part of the defendant is a factor that will militate against selection of the state of injury as the state of the applicable law.

Restatement (Second) of Conflicts of Law § 145 cmt. e. (1971) (emphasis added).

-10-

The parties in this case are Zurich and USF&G. Washington's status as the place CF used to do business bears little relation to the current dispute between Zurich and USF&G. USF&G had little reason to foresee an excess verdict in Missouri would result in injury in Washington, or that a bad faith claim brought against it by a New York corporation doing business in Illinois would be governed by Washington law. We do not believe Washington has a significant interest in resolving this bad faith claim between two insurers, arising from litigation in Missouri, simply because a dissolved insured was once located in Washington. Under the particular circumstances involved here, the district court did not err when it determined the first Section 145 factor does not favor Washington law.

The second factor under a Section 145 choice-of-law analysis is the place where the conduct causing the injury occurred. Zurich concedes, and we agree, the injurious conduct in a bad faith failure-to-settle case occurs where the settlement negotiations took place or should have taken place. See, e.g., Bristol W. Ins. Co. v. Whitt, 406 F. Supp. 2d 771, 788 (W.D. Mich. 2005). Zurich argues, however, this factor is not of primary importance where the settlement negotiations occur in one forum but create harm to the insured in another state. See id. at 788-89. Zurich further contends this factor favors neither Washington or Missouri because most of the settlement negotiations occurred in Texas, where TIG (USF&G's claims manager) was located.

The district court found nearly all of the settlement negotiations took place in Missouri. This conclusion is supported by the record. The global mediation which took place in April 2004 occurred in Kansas City, Missouri. The Silva plaintiffs demanded $5 million from CF, and TIG (acting on behalf of CF) offered $250,000 in return. In late 2005, the Silva plaintiffs and TIG had additional settlement discussions. Those discussions took place in St. Louis where the offices of the CF Trust's trial counsel were located. Just prior to trial, the CF Trust made one more

attempt to settle the remaining claims against it by offering $500,000, and the Silva plaintiffs responded by demanding $4.75 million. Those settlement negotiations also occurred in St. Louis. Finally, during trial, the CF Trust made its high-low settlement offer of $250,000-$2 million. This final settlement negotiation also occurred in Missouri because the trial was held in St. Louis. Thus, the district court did not err in concluding the second Section 145 factor favors Missouri over Washington.

The third Section 145 factor is the domicil, residence, nationality, place of incorporation and place of business of the parties. The parties to this lawsuit are Zurich, a New York corporation with its principal place of business in Illinois, and USF&G, a Maryland corporation with its principal place of business in Minnesota.[5] The district court determined this factor favored neither Washington or Missouri because the parties to this lawsuit were not incorporated in either Washington or Missouri, and the parties did not have their places of business in either of those two states.

Zurich argues the district court erred by not considering the place of incorporation and place of business of CF, the underlying insured. CF is not a party to this lawsuit. Zurich nonetheless argues the relationship between CF and its primary insurer, USF&G, should be the most relevant consideration under this Section 145 factor in a suit involving a bad faith failure-to-settle claim. We disagree. In American Home Assurance Co. v. L&L Marine Service, Inc., 153 F.3d 616 (8th Cir. 1998), we considered whether a non-party insured's place of incorporation or place of business was relevant to a choice-of-law analysis. A garnishment action was brought by a primary insurer (acting as a subrogee of the non-party insured) against the insurer of a company found to be at fault in causing a barge accident. Id. at 618.

_____

[5]TIG Insurance Company, the other party involved in this lawsuit as the claims handler of all CF claims on behalf of USF&G, is a California corporation with its principal place of business in Texas.

-12-

Both the insured and the at-fault company were Missouri residents, but neither was a party to the garnishment action. Id. at 619. The parties to the garnishment action were the two insurance companies, both of whom were New York corporations. Id. at 618-19.

Because the case involved the at-fault company's insurance contract, the court conducted a contracts choice-of-law analysis under Section 188 of the Restatement (Second) of Conflict of Laws. Id. at 620. Section 188 requires the court to consider the same factor at issue here, i.e., "the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188(2)(e) (1971). In interpreting this phrase, our court rejected the claim that the non-party insured's home state was relevant to the choice-of-law analysis instead focused on the home state of the actual parties in the garnishment action, the two insurance companies. Am. Home, 153 F.3d at 619-20.

Zurich's contention CF's place of incorporation and place of business is relevant to the third factor of a Section 145 analysis, despite CF's non-party status, is inconsistent with the plain language of the Restatement, which requires us to consider the *parties'* places of incorporation and places of business. Nor are we persuaded by Zurich's attempts to distinguish American Home because the case involved admiralty insurance, or interpreted a different Restatement provision. The admiralty nature of American Home had no bearing on the court's choice-of-law analysis, and the Restatement provision interpreted in American Home is identical to the factor we consider here. Moreover, as we discussed above, Washington's only connection to this bad faith failure-to-settle case is that CF once did business there, but CF dissolved prior to most of the operative facts. We find no error in the district court's conclusion that this third factor favored neither Missouri or Washington.

The fourth and final Section 145 factor is the place where the relationship, if any, between the parties is centered. Zurich again contends the focus should be on

-13-

the relationship between the insured and the primary insurer, and urges the application of Washington law because USF&G issued its insurance policy to CF in Washington. In its brief, Zurich argued "[a]bsent their relationship with CF, the parties would have never been brought together." Appellant's Brief at 30-31. We interpret Zurich's argument to mean the center of the relationship between the parties in this case, Zurich and USF&G, should focus on their respective contractual relationships with the mutual insured, CF. In response, USF&G argues we should focus on the forum of the underlying litigation as the place where the parties' relationship is centered in a bad faith failure-to-settle claim.

The district court conducted a dual analysis of this factor. Assuming the most pertinent relationship in a bad faith failure-to-settle case is the relationship between the insured and the primary insurer, the district court placed little weight on where the insurers issued CF's policies. The district court reasoned CF was engaged in interstate trucking and its insurers were on notice that coverage disputes could arise in states other than Washington. In the alternative, the district court assumed the pertinent relationship in this bad faith failure-to-settle case is the relationship between the actual parties, the two insurance companies. The district court then concluded the relationship between the insurers was centered in Missouri where the underlying litigation occurred, and not Washington where their independent contractual relationships with CF were formed.

The dispute is therefore over which "relationship" is pertinent in a bad faith failure-to-settle claim – the contractual relationship between insurer and insured giving rise to the duty to settle the underlying litigation within the policy limits, or the relationship between the actual parties to the bad faith claim arising from the underlying litigation itself. Both relationships may be pertinent to the choice-of-law analysis in a bad faith failure-to-settle case, because Section 145 requires consideration of all contacts parties may have with different states to determine which

-14-

are most significant. Which relationship is more significant when centered in different jurisdictions depends upon the facts of each particular case.

In this particular case, two facts are significant in supporting the district court's choice of Missouri over Washington in determining where the relationship between the parties was centered. First, the two parties' mutual insured, CF, is not a party to this action. Zurich, the excess carrier, brought this bad faith claim in its own name against USF&G, the primary carrier. Section 145 directs us to consider the center of the *parties'* relationship. In this case, therefore, we believe the center of the parties' relationship is Missouri, where the tort involved in the underlying action occurred and where the conduct giving rise to the alleged tort of bad faith failure-to-settle occurred. The two insurers' connection to the underlying litigation, and this tort litigation, is more central to a tort-based choice-of-law analysis under Section 145 than is the two insurers' contractual relationships with a non-party insured. Cf. Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 151-52 (2d Cir. 2008) (analyzing a choice-of-law issue in a bad faith failure-to-settle cross-claim between two insurers and concluding the "location of the subject matter," where the underlying suit was "filed, tried and ultimately settled" and where "the parties participated in a mediation session and a settlement conference[,]" controlled over the "location of the insured risk," which included where the insurance policy was issued to the mutual insured).

Second, CF was an interstate trucking company and the risks covered by the policies issued by the primary and excess carriers spread throughout the United States. In such a case, the district court was correct to place less weight on the location of the contractual relationship between the insured and the insurers, and more weight on the location of the underlying litigation. See Rupp v. Transcon. Ins. Co., 627 F. Supp. 2d 1304, 1315 (D. Utah 2008) (conducting a Section 145 analysis in a bad faith failure-to-settle claim and concluding the parties' relationship was centered in Utah where "the accident giving rise to the suit and subsequent claim for coverage occurred . . . the litigating attorneys were based . . . the case was mediated

-15-

twice . . . and the case was ultimately settled" instead of where the policies were issued to the mutual insured in California because "the insurance companies are not California companies and the risks covered by the policies spread throughout the United States"); see also Sentry Select Ins. Co. v. Hosmer, No. 08-4254-CV-C-NKL, 2009 WL 2151557, at *4 (W.D. Mo. July 17, 2009) (conducting a Section 145 analysis in an insurance coverage dispute and discounting the place where the insurance policy was issued because "it was issued to an interstate trucking company [and] the parties to that contract would be on notice that coverage disputes could arise" in other states).  We therefore conclude the district court did not err when it determined this fourth factor favored Missouri over Washington.

Finally, after identifying Missouri as the state with the most significant and relevant contacts to Zurich's bad faith claim against USF&G, the district court determined that applying Missouri law was consistent with the policy concerns set forth in Section 6 of the Restatement (Second) of Conflict of Laws.  The district court acknowledged Washington's interest in protecting its residents from insurance companies that act in bad faith by refusing to settle cases within the policy limits, but noted "this is not a case where a Washington resident or business will be affected by the application of another state's law." Addendum at 13.  The district court concluded Missouri's "interest in ensuring that the parties to litigation in its courts attempt to settle in good faith" supported the application of Missouri law.  Id. at 13-14.

We agree with the district court.  In American Home, a New York insurer brought a garnishment action against another insurer seeking the application of Missouri law because its insured was a Missouri resident.  153 F.3d at 619.  The Missouri insured was not a party to the garnishment action, so "no Missouri resident [was] seeking to enforce its rights" in the garnishment action and we concluded the "application of Missouri law would not further the interests of that state." Id.  The situation here is similar.  The Washington insured is not a party to this action.  This suit was brought by one insurer against another, neither of whom is a resident of

Washington. No Washington resident is seeking to enforce its rights in this case, and the application of Washington law will not further the interests of that state. In contrast, Missouri has an interest in having its litigants act in good faith. Because Zurich failed to identify Washington as a state "with a relationship to, or an interest in the issues that approaches Missouri's[,]" United States v. Conservation Chem. Co., 653 F. Supp. 152, 177 (W.D. Mo. 1986), the district court did not err in applying Missouri law.

B

Zurich next contends the district court erred when it determined Zurich's bad faith claim fails under Missouri law because the insured never made a demand for USF&G to settle the Silva litigation within the primary policy limits. One of the necessary elements of a bad faith failure-to-settle claim under Missouri law is that "the insured has demanded that the insurer settle the claim brought against the insured[.]" Dyer v. Gen. Am. Life Ins. Co., 541 S.W.2d 702, 704 (Mo. Ct. App. 1976); see also Bonner v. Auto. Club Inter-Ins. Exch., 899 S.W.2d 925, 928 (Mo. Ct. App. 1995) ("We will not allow a claim for bad faith to stand when there was no demand made to settle, either within or outside of the policy limits. This is an essential element of the tort."). Missouri recognizes two exceptions to this general rule. One exception, inapplicable here, is when the insurer denies coverage and refuses to defend. See Shobe v. Kelly, 279 S.W.3d 203, 210 (Mo. Ct. App. 2009). The second exception is when the insured is not informed by the insurer of settlement offers, generally referred to as the Ganaway exception. See Ganaway v. Shelter Mut. Ins. Co., 795 S.W.2d 554, 564 (Mo. Ct. App. 1990).

The district court found the CF Trust was the proper party to demand a settlement within USF&G's policy limits, and the CF Trust never made such a demand. Zurich argues there are genuine issues of fact which preclude the entry of summary judgment on the issue of whether the Ganaway exception applies. Zurich

contends USF&G and TIG did not keep the CF Trust advised of the Silvas' settlement offers. We disagree. The record shows the Silva plaintiffs only made two settlement offers, the first for five million dollars at the global mediation in April 2004, and the second for $4.75 million at the time of trial (made during jury selection and reiterated in response to TIG's high-low offer in the middle of trial). The CF Trust was advised of both settlement demands, and elected not to settle because it believed CF's exposure in the underlying accident was much less than the Silva plaintiffs wanted. As a consequence, the CF Trust never demanded that USF&G settle the case within the five million dollar policy limits, despite being urged to do so by Zurich.

Zurich argues Missouri recognizes a third exception to the general rule that a demand to settle within the policy limits is an essential element of a bad faith failure-to-settle claim. Citing a concurring opinion in State Farm Fire & Casualty Co. v. Metcalf, by Wade, 861 S.W.2d 751 (Mo. Ct. App. 1993), Zurich claims a settlement demand is not essential when the insurer reserves to itself the exclusive right to make settlements. See id. at 758 (Shrum, J., concurring). Zurich argues this exception applies here because of CF's bankruptcy. Zurich contends TIG exercised the exclusive right to settle the Silva lawsuits because the CF Trust had no financial interest in the Silva litigation, and did not have authority to demand that USF&G settle the Silva claims within the policy limits because the USF&G policy was not among the contracts assumed by the bankruptcy estate.

Assuming *arguendo* Missouri would recognize this third exception, we conclude the factual premise for Zurich's argument is lacking. First, the CF Trust had a financial interest in the outcome of the Silva litigation because the USF&G policy was a fronting policy secured with eighty-seven million dollars in CF's collateral. That collateral became part of the bankruptcy estate. When the automatic stay was lifted as to the Silva lawsuits, it exposed CF's collateral up to the five million dollar retention limit under the USF&G policy. Zurich claims this still did not give the CF Trust a financial interest in the outcome of the Silva litigation because USF&G had

filed proofs of claim against CF in the bankruptcy in excess of the amount of CF's pledged collateral. We disagree. The CF Trust still had a financial incentive in the Silva lawsuits because a favorable result would reduce the likelihood or size of any unsecured claim made by USF&G in CF's bankruptcy. Second, the USF&G policy was among the contracts the CF Trust controlled and was directed to manage. Because the USF&G policy was not an executory contract, it was automatically assigned to the CF Trust under the Bankruptcy Code. See 11 U.S.C. § 541(a); Nat'l Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.), 837 F.2d 325, 328-29 (8th Cir. 1998). Contrary to Zurich's contention, once CF dissolved and all of CF's remaining property was transferred to the CF Trust, the latter was the only entity which had authority to demand that USF&G settle the Silva lawsuits within the policy limits. The fact that the CF Trust did not, even though it was advised of the limited settlement offers made by the Silva plaintiffs, is fatal to Zurich's bad faith claim under Missouri law.

C

Finally, the district court held Zurich's claim would fail in any event because Missouri law does not allow an excess carrier to bring a bad faith failure-to-settle claim in its own name against a primary carrier. See Reliance Ins. Co. in Liquidation v. Chitwood, 433 F.3d 660, 664 (8th Cir. 2006) ("Missouri courts . . . have not recognized a direct duty of good faith between primary and secondary insurers."). Zurich nonetheless contends Missouri would allow a direct action between insurers when such an action is based upon principles of equitable subrogation. In light of our conclusion that Zurich's bad faith claim fails because its insured never made a demand of the primary insurer to settle the underlying litigation within the policy limits, we need not address this argument.

-19-

## III

We affirm the judgment of the district court.

_____