# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-3334
_____

Christopher Y. Meek, Individually and On Behalf of All Others Similarly Situated

*Plaintiff - Appellee*

v.

Kansas City Life Insurance Company

*Defendant - Appellant*

_____

No. 23-3354
_____

Christopher Y. Meek, Individually and On Behalf of All Others Similarly Situated

*Plaintiff - Appellant*

v.

Kansas City Life Insurance Company

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: September 24, 2024
Filed: January 10, 2025

_____

Before SMITH, ERICKSON, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Life insurance can be expensive, but Christopher Meek alleged that Kansas City Life Insurance Company inflated the price for thousands of Kansans. Although neither side is happy with the district court's[1] decision to award roughly one million dollars in damages, we affirm.

I.

About forty years ago, Meek bought a "universal life insurance" policy. It combined two products into one, a standard life-insurance policy with a savings account. The premiums that Meek paid each month went directly into the savings account, which Kansas City Life debited to cover monthly charges, including the "cost of insurance." Anything left over increased the "cash value" of the account, which Meek would receive if he surrendered the policy. The higher the cost of insurance and the other expenses, the lower the cash value.

The cost of insurance expressly included four factors: a policyholder's "sex, age[,] . . . risk class," and "expect[ed] . . . future mortality experience." But, according to Meek, Kansas City Life introduced a fifth one, profits and expenses, which the policy did not mention. Faced with a lower cash value, Meek filed a federal lawsuit for breach of contract and conversion. Not long after, the district court certified a class of about 6,000 Kansans with Meek as lead plaintiff.

Both sides moved for summary judgment. The initial question for the district court was whether Meek timely filed his lawsuit under Kansas's five-year statute of

_____

[1]The Honorable Beth Phillips, Chief Judge, United States District Court for the Western District of Missouri.

limitations for breach-of-contract claims. *See* Kan. Stat. Ann. § 60-511(1). Viewing each monthly deduction as a separate violation, the district court concluded that the answer was yes for payments going back five years. For any older claims, Meek would have to establish that equitable estoppel prevented Kansas City Life from raising a statute-of-limitations defense.

Next came the resolution of the dueling summary-judgment motions. The conversion claim immediately fell away because Kansas law does not recognize one without an "obligation to return identical money." *Temmen v. Kent-Brown Chevrolet Co.*, 605 P.2d 95, 99 (Kan. 1980).

The breach-of-contract claim required more work. Closely examining the policy, the district court concluded that Meek's "interpretation [was] reasonable and [Kansas City Life's] interpretation, at best, demonstrate[d] . . . ambigu[ity]." Under the canon of *contra preferentem*, it construed any ambiguity against the drafter, which in this case was Kansas City Life. The result was partial summary judgment in Meek's favor.

The jury then had to decide how much to award as damages. It settled on just over $5 million for claims going back nearly 40 years, which dropped to $908,075 under the statute of limitations. Both sides now appeal the parts of the judgment with which they disagree.

## II.

One of those is Kansas City Life's challenge to class certification. It required a finding that the plaintiffs satisfied each of the requirements of Federal Rule of Civil Procedure 23(a) and at least one in 23(b). Kansas City Life argues that there was no common "question[] of law or fact," Fed. R. Civ. P. 23(a)(2), and that, even if there was, it did not "predominate over any questions affecting . . . individual members," *id.* (b)(3). Our review is for an abuse of discretion. *See Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019).

The two requirements are related. As we recently explained, "[c]ommonality is subsumed within . . . predominance," which is "even more demanding." *Cody v. City of St. Louis ex rel. Medium Sec. Inst.*, 103 F.4th 523, 530 (8th Cir. 2024) (citation omitted). To satisfy both, a plaintiff must not only establish the existence of a common injury "capable of classwide resolution," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), but one that "is susceptible to generalized, class[]wide proof," *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 Newberg & Rubenstein on Class Actions § 4:50 (5th ed. 2012)). The ultimate question is whether the "aggregation-enabling[] issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting Newberg & Rubenstein, *supra*, § 4:49).

Common here were the provisions defining the cost of insurance across the class members' policies and the Kansas law required to interpret them. As a mostly legal question, figuring out what the cost of insurance included did not require much in the way of proof. And to the extent Kansas City Life thought it did, the evidence was the same across policies and plaintiffs. The matching policy language provided the necessary commonality, which predominated over other issues.

Not so, claims Kansas City Life, because some of the plaintiffs lacked "concrete, particularized, and actual" injuries. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Some never cashed out because they had already received a death benefit, and others had lower cost-of-insurance rates under Kansas City Life's calculation, leaving both groups without standing to sue.

Standing, however, was not the problem. The members of the class suffered a concrete harm when Kansas City Life breached their insurance contracts, "a judicially cognizable interest for standing purposes." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018) (citation omitted). This "same injury" spanned the entire class. *Wal-Mart Stores*, 564 U.S. at 350 (citation omitted).

Even if individual damages varied, what mattered was Meek provided a way of measuring them "on a classwide basis," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), ensuring that "common questions of liability" predominated over "individual damage calculations," 4 Newberg & Rubenstein on Class Actions § 12:4 (6th ed. 2024). *See Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 421 (5th Cir. 2023) (observing that "[w]hat matters for class certification is . . . whether [p]laintiffs' damages model can be applied in a uniform manner across the class"). At that point, Rule 23 gave the district court the discretion to certify the class. *See Hale*, 942 F.3d at 403.

## III.

Next up is another choice: Kansas or Missouri law? It makes a difference for the availability of the conversion claim and the statute of limitations applicable to the breach-of-contract claim. We review a district court's choice-of-law determination de novo. *See C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1148 (8th Cir. 2023). Missouri is the forum state, so its rules apply. *See id.*

## A.

The parties agree on the starting point for the conversion claim, which is the "most significant relationship test." *Livingston v. Baxter Health Care Corp.*, 313 S.W.3d 717, 721 (Mo. Ct. App. 2010); *see* Restatement (Second) of Conflict of L. § 145. Meek disputes whether Kansas has a significant enough relationship, given that Kansas City Life managed the savings-account funds in Missouri. The choice matters because a custodian who diverts money from a "specific purpose" commits conversion in Missouri, *Dillard v. Payne*, 615 S.W.2d 53, 55 (Mo. 1981), but not in Kansas, *see Temmen*, 605 P.2d at 99.

To assess which state's law governs a tort claim like conversion, Missouri courts look to the following factors: "(a) the place where the injury occurred, (b) the

place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 26 (Mo. Ct. App. 2004) (quoting Restatement (Second) of Conflict of L. § 145(2)). When the wrongful conduct and the injury occur in two different states, Missouri adds a tiebreaker: "the place where the act t[ook] harmful effect or produce[d] the result complained of is the more significant contact." *Am. Guar. & Liab. Ins. Co. v. U.S. Fid. & Guar. Co.*, 668 F.3d 991, 997 (8th Cir. 2012) (citation omitted); *see Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 797 (8th Cir. 1990).

This case requires the tiebreaker. The allegedly wrongful conduct—the "unauthorized assumption of the right of ownership over" the policyholders' money—happened in Missouri. *Colton, McMichael, Lester, Auman, Visnovske, Inc. v. Mueller*, 896 S.W.2d 741, 742 (Mo. Ct. App. 1995) (defining conversion); *see Bank v. Parish*, 264 P.3d 491, 498 (Kan. Ct. App. 2011) (adopting a similar definition). But the harm itself, the loss of cash value, had its impact in Kansas, where they lived. Although Meek thinks the harm occurred in Missouri, the place where Kansas City Life kept his money, the "legal character" of the injury is what counts. *Kan. City Star Co. v. Gunn*, 627 S.W.2d 332, 334 (Mo. Ct. App. 1982). And here, the policyholders would have received their diminished cash-value payouts in Kansas, so the tiebreaker leans in its favor.

B.

Kansas's statute of limitations for contract claims also comes out on top. What matters here is Missouri's borrowing statute, which provides that "[w]henever a cause of action has been fully barred by the laws of the state . . . in which it originated, said bar shall be a complete defense to any action thereon." Mo. Rev. Stat. § 516.190. The district court concluded that the breach-of-contract claim "originated" in Kansas, *id.*, and we agree.

A "cause of action originates under Missouri law 'at the place where plaintiff's alleged damages stemming from the pleaded cause of action are sustained and capable of ascertainment.'" *Rajala v. Donnelly Meiners Jordan Kline, P.C.*, 193 F.3d 925, 928 (8th Cir. 1999) (quoting *In re Master Mortg. Inv. Fund, Inc.*, 151 B.R. 513, 516 (Bankr. W.D. Mo. 1993)). For a "purely economic injury," it is where the "plaintiff is financially damaged." *Great Plains Tr. Co. v. Union Pac. R. Co.*, 492 F.3d 986, 993 (8th Cir. 2007). Just like the conversion claim, the "financial[] damage[]" occurred in Kansas. *Id.*

From Meek's perspective, the class members' claims were only "capable of ascertainment" once they became a matter of "public record" through the filing of this lawsuit in Missouri. *Ferrellgas, Inc. v. Edward A. Smith, P.C.*, 190 S.W.3d 615, 621 (Mo. Ct. App. 2006). The key distinguishing fact in *Ferrellgas*, a legal-malpractice case, was that an adverse verdict first provided notice of the harm. *See id.* at 620. Here, by contrast, the class members received notice of their injuries in Kansas, every time they opened a statement showing a lower-than-expected cash value. *See Rajala*, 193 F.3d at 928 (observing that a claim is "capable of ascertainment when the fact of damage *can be* discovered or made known" (emphasis added) (citation omitted)). On that basis, Kansas's five-year statute of limitations applies. *See id.*; *see also* Kan. Stat. Ann. § 60-511(1).

IV.

With those preliminary issues out of the way, we move on to the grant of summary judgment, which we review de novo. *See Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020). It "is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

-7-

A.

The entire case ultimately revolves around the cost-of-insurance provision in Kansas City Life's policies. From its perspective, it has nearly unlimited discretion in adjusting the cost of insurance. Meek and the other policyholders argue that an ordinary reader would treat the list of factors as exclusive.

There is not much to interpret. To quote one representative policy, "[t]he cost of insurance . . . is based on the insured's sex, age[,] and risk class" and "[Kansas City Life's] expectations as to future mortality experience." Conspicuously missing is any mention of profits and expenses.

Under Kansas law, "[w]ords used in an insurance policy are to be read and understood in their ordinary and usual meaning," another way of saying that the policy "should [be] enforce[d] . . . as written." *Evergreen Recycle, L.L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 350 P.3d 1091, 1118 (Kan. Ct. App. 2015). One tool for uncovering a contract's plain meaning is to apply the "canons of contract construction," *Arnold v. Foremost Ins. Co. Grand Rapids, Mich.*, 379 P.3d 391, 397 (Kan. Ct. App. 2016), which resemble those used to interpret statutes, *see Metro. Life Ins. Co. v. Strnad*, 876 P.2d 1362, 1366 (Kan. 1994) (applying the *expressio unius* canon to a contract); *Trego WaKeeney State Bank v. Maier*, 519 P.2d 743, 748 (Kan. 1974) (same for the *ejusdem generis* canon).

A canon that helps here is *expressio unius est exclusio alterius*—a Latin phrase meaning "the expression of one thing is the exclusion of the other." *State v. Young*, 490 P.3d 1183, 1191 (Kan. 2021). Also called the negative-implication canon, it suggests that mentioning "sex, age[,] . . . risk class," and "expect[ed] . . . future mortality experience" gives the impression that there are no other factors. *See Clark v. Prudential Ins. Co. of Am.*, 464 P.2d 253, 257 (Kan. 1970). And even if there were room to consider others, the *ejusdem generis* canon would limit them to "things of the same kind or within the same classification" as those listed. *R.P. v. First Student Inc.*, 515 P.3d 283, 288–89 (Kan. Ct. App. 2022). Not profits and

-8-

expenses, in other words, which look nothing like the listed factors. *See Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 761 (8th Cir. 2020) (dealing with a similar universal-life-insurance policy).

The remainder of the policy points in the same direction. *See Universal Underwriters Ins. Co. v. Hill*, 955 P.2d 1333, 1337 (Kan. Ct. App. 1998) ("The policy must be read as a whole."). The main reason is that expenses come into play elsewhere. Right after the definition of the cost of insurance is a description of "expense charges," which is the "amount [Kansas City Life] deducts . . . based on [its] expectations as to future expenses." It seems unlikely that the policy would allow Kansas City Life to make the same monthly deduction twice, once as an expense charge and again as part of the cost of insurance. *See LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) (observing that an interpretation of an insurance policy "should not render any term meaningless"); *see also Brazil v. Auto-Owners Ins. Co.*, 3 F.4th 1040, 1043–44 (8th Cir. 2021) (discussing the canon against surplusage).

Kansas City Life's arguments to the contrary largely confirm our interpretation, rather than cast doubt on it. The first relies on a provision promising that the "current cost[-]of[-]insurance rates will never be increased to recover losses incurred, or decreased to distribute gains realized by [Kansas City Life] prior to the change." Translated here, it says what Kansas City Life *cannot* do, which is increase or decrease the cost of insurance to account for past gains or losses. Nothing in there says when it *can* adjust the cost of insurance. From the standpoint of an "ordinary insured," it all but confirms that Kansas City Life *cannot* change the cost of insurance based on profits and expenses. *Clark*, 464 P.2d at 257.

The same goes for the one limiting changes to the cost of insurance made "on a uniform basis for [i]nsureds of the same age, sex[,] and risk class whose policies have been in force for the same length of time." Kansas City Life claims that limiting its ability to adjust the cost of insurance would be redundant if it says elsewhere that it can only consider those factors in the first place. This logic misses an obvious

alternative explanation.  The provision simply clarifies *how* to implement changes to the cost of insurance: on a "uniform basis."  Reading anything more into it adds something that is not there.

Finally, Kansas City Life argues that there must be some implied mathematical formula, because it is impossible to generate cost-of-insurance rates from only an individual's sex, age, and risk class.  It is true that "ordinary purchaser[s] of insurance would not know from the [p]olicies exactly *how* [cost-of-insurance] rates are calculated."  *Karr v. Kan. City Life Ins. Co.*, — S.W.3d —, 2024 WL 4280503, at *10 (Mo. Ct. App. Sept. 24, 2024) (emphasis added), *application for transfer denied* (Mo. Oct. 29, 2024).  But Kansas City Life still cannot add whatever it wishes to the calculation, because purchasers "*would* understand from the plain language of the [p]olicies [that] the [cost-of-insurance] rates are based on" the listed factors.  *Id.* (emphasis added).  The opposite is true of profits and expenses, which the cost-of-insurance provision never mentions.

## B.

Even if these counterarguments gave rise to ambiguity, we would come out the same way.  Kansas law lays out two possibilities for resolving it: either allow Kansas City Life to present extrinsic evidence of the policy's meaning, or apply the *contra preferentem* canon, which resolves any ambiguity against the drafter.

Kansas City Life offers three types of extrinsic evidence.  The first is from Meek, who testified that he thought the cost of insurance was another way to refer to the premium he paid each month.  From there, Kansas City Life argues that no reasonable person would think an insurer determines premiums without reference to the insurer's finances, so he must have understood that non-mortality factors played a role in calculating the cost of insurance.  Another supposedly conveys information about industry practices for calculating the cost of insurance.  And the final piece of evidence was a handout for independent agents.  It stated that the cost of insurance

-10-

"typically include[s] amounts to cover expenses and taxes and provide some profit for the risk assumed."

None of this evidence, however, is particularly helpful. Meek's testimony does not necessarily reflect what a "reasonable person in the position of the insured would understand it to mean." *Fowler v. United Equitable Ins. Co.*, 438 P.2d 46, 48 (Kan. 1968). And even if it counted for more, his subjective understanding only reveals confusion about the meaning of the phrase, not that it included other factors. As for the industry practice and what the sales agents knew, there is no evidence that any purchaser of insurance ever learned about either.

Kansas City Life fares no better under *contra preferentem*, often treated as a last-resort canon, because it requires us to choose the construction that favors Meek and the other policyholders. *See O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002); *see also Harding v. Capitol Fed. Sav. Bank*, 556 P.3d 910, 919 (Kan. Ct. App. 2024) (requiring courts "to strictly construe any ambiguous language against the drafter of the contract"). Kansas City Life's only real objection is that limiting the cost of insurance to the listed factors would be a mixed bag for policyholders, some of whom benefited from its approach.

Even if true, *contra preferentem* is about construing the *ambiguity* against the drafter, who we assume is at fault for it. *See O'Bryan*, 56 P.3d at 792. Giving Kansas City Life unlimited discretion to raise and lower the cost of insurance based on its unilateral assessment of its own profits and expenses would *reward* it for the ambiguity. And as we already know from the jury verdict, the exercise of discretion was a net negative to policyholders to the tune of more than $5 million, even if some ended up better off. If *contra preferentem* has a role to play, this case appears to be as good a candidate as any for its application.

-11-

Only a couple of loose ends remain, each challenging the damages award. On one side, Kansas City Life argues that the evidence was insufficient to support an award of any amount. On the other, Meek thinks it should have been higher.

A.

Kansas City Life believes it should have received judgment as a matter of law because Meek's evidence did not reliably establish an alternative cost-of-insurance calculation. Our review is de novo, *see Wedow v. City of Kansas City*, 442 F.3d 661, 669 (8th Cir. 2006), but we must view "the evidence in the light most favorable to the jury's verdict," *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 776 (8th Cir. 2024) (citation omitted). Like the district court, we will not set the verdict aside "unless there is a complete absence of probative facts." *Id.* (citation omitted).

"The basic goal in awarding contract damages is to put the nonbreaching party in the position [it] would have been in had the breach never occurred, without allowing [it] a windfall." *Louisburg Bldg. & Dev. Co., L.L.C. v. Albright*, 252 P.3d 597, 612 (Kan. Ct. App. 2011); *see Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (noting that "damages to the plaintiff" are an element of a breach-of-contract claim). The calculation need not be precise. If there is "some reasonable basis for computation which will enable the trier of fact to arrive at an approximate estimate," *Peterson v. Ferrell*, 349 P.3d 1269, 1275 (Kan. 2015) (citation omitted), we will let the verdict stand, *see AmGuard*, 116 F.4th at 776.

Here, there was. The class members' policies listed the same factors. Meek's expert used them to calculate what the cash value of each policy would have been in the absence of profits and expenses, using the mortality assumptions that Kansas City Life provided. He then calculated damages by comparing his overall figures with the ones the company used. His methodology, which Kansas City Life questions in various ways, may not have been perfect, but it resulted in a reasonable,

non-speculative approximation for the jury. *See Penney v. Praxair, Inc.*, 116 F.3d 330, 334 (8th Cir. 1997) (noting that when reviewing a "denial of . . . judgment as a matter of law," the appellate court "do[es] not reweigh the evidence or consider the credibility of the witnesses").

According to Kansas City Life, the expert's analysis had one fatal flaw: it never accounted for the policyholders who were unharmed by the lower cash values because they eventually received death benefits. Although their damages may not have been as high as those who cashed out during their lifetimes, the expert showed that paying the higher premiums still harmed them. Even if Kansas City Life disagrees, the jury was free to accept his calculations. *See Vogt*, 963 F.3d at 770 (holding that there was "no reason to limit damages merely because death benefits have been paid for a policyholder" because he "still suffered a depleted account value during his lifetime due to [the insurer's] overcharges of [cost-of-insurance] fees").

B.

And accept them it did, even if it did not outright adopt the expert's figure of about $18 million in total damages like Meek hoped. We review the refusal to grant an additur or a new trial for an abuse of discretion. *See AmGuard*, 116 F.4th at 776.

The jury awarded a little over $5 million for the nearly 40-year period from 1982 to 2021. Factoring in the statute of limitations led to a reduction to just under $1 million. Still, Meek believes that the class should have received the full $18 million.

The jury could have awarded more, but the evidence also supported a smaller verdict. Kansas City Life came forward with several witnesses who thought the

$18 million estimate was too high.[2]  It was then the jury's call on whom to believe. *See Penney*, 116 F.3d at 334.

Given the evidence going both ways, nothing suggests that the verdict was a product of an improper compromise.  As *Boesing v. Spiess* explains, a compromise verdict "results when [a] jury [that is] unable to agree on the issue of liability" decides to "award[] a party inadequate damages" to reach agreement.  540 F.3d 886, 889 (8th Cir. 2008).  Nothing like that could have happened here, even if the verdict took longer than expected, because the *only* issue the jury decided was damages.

## VI.

We accordingly affirm the judgment of the district court.

_____

---

[2]The district court did not abuse its discretion in cutting off questioning about an alternative damages calculation made by Kansas City Life's chief actuary.  *See Kozlov v. Assoc. Wholesale Grocers, Inc.*, 818 F.3d 380, 396 (8th Cir. 2016).