# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1375
_____

Academy Bank, N.A.; Shri Ganesai, LLC

*Plaintiffs - Appellees*

v.

Amguard Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 11, 2024
Filed: September 6, 2024

_____

Before SMITH, Chief Judge,[1] GRUENDER and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

     A fire damaged a hotel owned by Shri Ganesai, LLC (Shri). Shri had purchased insurance for the building from AmGuard Insurance Company (AmGuard) that covered the owner and the mortgagee, Academy Bank, N.A.

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

(Academy). Shri filed a claim for its loss, but AmGuard denied the claim based on suspected arson. The building suffered further damage from the elements during the investigation. Shri and Academy sued AmGuard for, among other things, vexatious refusal and breach of contract. The plaintiffs won a jury verdict against AmGuard. The district court[2] denied AmGuard's motions for judgment as a matter of law and a new trial. AmGuard appeals. We affirm.

## I. *Background*

Shri owned a Days Inn in Missouri and held an insurance policy on the property through AmGuard. Shri's mortgagee, Academy, was an additional insured on the policy.[3] The policy provided that, in the event of a covered loss, AmGuard would compensate Academy even if it denied coverage to Shri. In the event of such a denial, the policy's terms would apply directly to Academy. The policy contained a $5,000 deductible and was in effect until January 10, 2020.

On October 2, 2019, a fire damaged the hotel. AmGuard suspected that Shri's principal, Alex Patel, had set the fire. Consequently, AmGuard chose to assume control of the premises to investigate. AmGuard retained an independent adjuster, Colby Chavers. In an October report, Chavers noted the existence of the mortgage and initially estimated the actual cash value of Shri's loss at about $135,000. AmGuard completed its initial inspections of the hotel by November 11, 2019, but because of an oversight it did not release the premises to Shri until February 14, 2020.

In the interim, the building was vacant and without heat. Not surprisingly, additional damage resulted to the structure from vandalism and frozen pipes, though the parties dispute the timing of that damage. A few weeks after the fire, William

---

[2]The Honorable Beth Phillips, Chief Judge, United States District Court for the Western District of Missouri.

[3]KCB Bank was listed as the mortgagee in the policy, but Academy merged with KCB Bank and held the mortgage.

-2-

Cox, a public adjuster working on behalf of Shri, notified AmGuard's claims adjuster, Beatrice Cherry, that the hotel's power was off and cold weather was coming. He asked if Shri could begin mitigation efforts to avoid further damage to the structure. Cherry told Cox not to perform any remediation that would interfere with AmGuard's investigation. Aware of the state of the premises, Chavers expressed concern that plumbing damage was likely and asked AmGuard to consider hiring a plumbing contractor to test for damage, but AmGuard never authorized him to retain a contractor. During a cold snap, the pipes burst.

While vacant and water damaged, the hotel was also vandalized. Cherry received notice around January 23, 2020, that someone had broken into the hotel through a window on January 20. Chavers and Jason Ammerman, a second public adjuster working on behalf of Shri, both inspected the property on February 20, 2020, and saw vandalism damage. Ammerman later testified that he understood that someone had reported vandalism damage to the police on December 19, 2019. In December 2020, Cherry admitted, "We do understand on top of the fire damages that we have an exposure for frozen pipes and vandalism." R. Doc. 134-2, at 2.[4]

In November 2019, Academy contacted AmGuard about the fire loss. Thereafter Academy made additional inquiries. In May 2020, AmGuard told Academy (through Cherry) that it would not be paying Shri but would get back to Academy about how to obtain payment for the mortgagee coverage. AmGuard failed to do so. In March 2021, Academy demanded payment of more than $1.6 million, the total balance of the loans. AmGuard did not make any payment. In April, Academy sued AmGuard for breach of contract and vexatious refusal to pay the insurance claim, later adding a negligence claim. Shri also sued AmGuard, bringing the same claims. The plaintiffs sought breach-of-contract damages for the fire,

---

[4]Two cases were consolidated for trial before the district court. *See Acad. Bank, N.A. v. Amguard Ins. Co.*, No. 21-00219-CV-W-BP, 2022 WL 2825887 (W.D. Mo. July 8, 2022); *Shri Ganesai, LLC v. Amguard Ins. Co.*, No. 21-00355-CV-W-BP, 2022 WL 5082085 (W.D. Mo. July 26, 2022). Record citations are to *Shri Ganesai*, 2022 WL 5082085.

frozen pipes, and vandalism. In the alternative, they sought damages under a negligence theory for the frozen pipes and vandalism.

AmGuard made a payment to Academy in July 2021 and another payment in March 2022. At some point, Academy initiated the appraisal process provided for by the insurance policy, which resulted in an additional payment. In total, AmGuard paid Academy $781,516.33, and Academy stipulated to the dismissal of its claim as to the fire damage.

The court granted summary judgment to AmGuard on Shri's claim for vexatious refusal because there was evidence that Patel had set the fire. The parties tried the remainder of the claims before a jury in September 2022.

The court made several evidentiary rulings relevant to this appeal. AmGuard objected to the expert testimony of Tim Anderson, who testified about the freeze damage. The court overruled the objection. AmGuard sought to call Skylar Lizar to testify about the cause of the fire. The plaintiffs did not have contact information for Lizar and so had never deposed her. Lizar, however, attended the first day of trial, two days before AmGuard sought to call her as a witness. Notably, AmGuard did not inform the plaintiffs of her presence in the courtroom. AmGuard knew that the plaintiffs had been unable to depose her. The court excluded Lizar's testimony.

AmGuard also sought to read into evidence Patel's deposition, in which Patel had invoked his Fifth Amendment privilege against self-incrimination when questioned about the fire's cause. The court allowed AmGuard to read only part of the deposition. AmGuard also asked the court to instruct the jury that it could draw an adverse inference from Patel's invocation of the Fifth Amendment. The court declined to do so.

The jury returned a verdict for the plaintiffs on all counts. To prevent double recovery, the district court entered judgment for the plaintiffs on all but the

negligence claims. The court denied AmGuard's post-trial motions for judgment as a matter of law and a new trial.

## II. *Discussion*

AmGuard appeals the district court's denials of its motions for judgment as a matter of law and a new trial. Specifically, AmGuard challenges the viability of the vexatious-refusal claim, some of the court's evidentiary rulings, the court's refusal to give an adverse-inference instruction, and the sufficiency of the evidence of damages from vandalism and frozen pipes.

Missouri law applies in this diversity action. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "Under *Erie*, we are obligated to apply governing precedent from the [Missouri] Supreme Court. When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the same issue before us." *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010) (cleaned up). When we make this prediction, "decisions of the Missouri Court of Appeals are persuasive authority that we must follow when they are the best evidence of what state law is. We need not follow them, however, if we are convinced by other persuasive data that the Missouri Supreme Court would decide otherwise." *Turntine v. Peterson*, 959 F.3d 873, 883 (8th Cir. 2020) (cleaned up).

Even though Missouri law governs the claims here, the Federal Rules of Evidence control evidentiary questions. *See Two Rivers Bank & Tr. v. Atanasova*, 686 F.3d 554, 563 (8th Cir. 2012). And federal law governs our standards of review. *Kramer v. Cash Link Sys.*, 715 F.3d 1082, 1086 (8th Cir. 2013). We review de novo the district court's denial of AmGuard's motion for judgment as a matter of law. *See Wedow v. City of Kan. City*, 442 F.3d 661, 669 (8th Cir. 2006). We "view[] the evidence in the light most favorable to the jury's verdict" and "will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." *Id.* (internal quotation marks omitted). "We review the denial of a motion for a new trial for a clear abuse of discretion, with the key question being whether a

new trial is necessary to prevent a miscarriage of justice." *Williams v. Baum*, 48 F.4th 571, 573 (8th Cir. 2022) (internal quotation marks omitted).

## A. *Academy's Vexatious-Refusal Claim*

AmGuard argues that it is entitled to judgment as a matter of law on Academy's vexatious-refusal claim. Alternatively, AmGuard seeks a new trial on that claim because of the district court's exclusion of certain evidence.

### 1. *Viability of Academy's Vexatious-Refusal Claim*

AmGuard argues that "a claim for vexatious refusal must fail" when there is no "corresponding claim or judgment for breach of contract." Appellant's Br. at 19. AmGuard contends that the district court should not have entered judgment for Academy on the vexatious-refusal claim because Academy dismissed its breach-of-contract claim prior to trial and has not shown that AmGuard breached its contract.

We have observed that "[u]nder Missouri law, vexatious refusal is derivative of a breach-of-contract claim. There can be no recovery for vexatious refusal where there is no judgment for the plaintiff on the insurance policy." *Aziz v. Allstate Ins. Co.*, 875 F.3d 865, 869 (8th Cir. 2017) (citation omitted). But in *Aziz*, we decided that a vexatious-refusal claim must fail when an insured *loses* on a breach-of-contract claim. *Id.* We did not consider whether a vexatious-refusal claim is viable when the insured *settles* a breach-of-contract claim or the insurer pays an insurance claim after an appraisal.

Other cases demonstrate that a vexatious-refusal claim can survive a breach-of-contract settlement. For example, we have reversed a grant of summary judgment and remanded for trial on a vexatious-refusal claim when the parties had settled the underlying insurance dispute. *See Wood v. Foremost Ins. Co.*, 477 F.3d 1027, 1029 (8th Cir. 2007). We noted that Missouri law provides for statutory damages, interest, and attorney's fees for vexatious refusal. *Id.*

*Wood* is consistent with Missouri state-court decisions. The Supreme Court of Missouri has affirmed an award for vexatious refusal based in part on the delay between notice of a claim and the insurer's payment to a mortgagee. *See DeWitt v. Am. Fam. Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. 1984) (en banc). In *DeWitt*, there was also an existing breach-of-contract claim based on the insurer's failure to pay other amounts due, but in affirming the vexatious-refusal award, the court primarily considered the insurer's delay in paying amounts that *had* been paid. *Id.* at 704, 710.

Furthermore, the Supreme Court of Missouri has affirmed an award for vexatious refusal when the insurer paid the amount due under the policy prior to trial. *See Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 457 (Mo. 2006) (en banc). The court held that "[a] claim of interest is sufficient to support an award of damages or attorney's fees under [Missouri Revised Statute §] 375.420." *Id.* AmGuard distinguishes *Dhyne* because in that case there was a surviving claim for interest and the insurer had initially outright refused to pay the insurance claim. But the *Dhyne* court noted that

> the purpose of section 375.420 is to make the contracting party whole in a practical sense and to provide an incentive for insurance companies to pay legitimate claims without litigation. Adopting [the insurer's] argument would permit an insurance company to refuse payment and avoid liability under section 375.420 by simply paying prior to trial. Such an interpretation would, from a practical standpoint, eliminate section 375.420.

*Id.* (cleaned up).

Here, adopting AmGuard's argument would have a similar effect. AmGuard argues that, unlike the insurer in *Dhyne*, it never refused to pay the claim. Yet AmGuard waited over a year and a half before paying Academy even the undisputed portion of the claim. Under Missouri law, a vexatious failure to pay is compensable even if unaccompanied by a blatant refusal. *See* Mo. Rev. Stat. § 375.296 (providing for recovery "if the insurer has *failed* or refused [to pay] for a period of thirty days

-7-

after due demand" (emphasis added)); *Dhyne*, 188 S.W.3d at 458 ("[D]irect and specific evidence of vexatious refusal is not required and 'the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case.'" (quoting *DeWitt*, 667 S.W.2d at 710)). AmGuard's eventual engagement in the appraisal process and subsequent full payment did not cure its earlier vexatious conduct.

AmGuard contends that Missouri Revised Statute § 375.420 supports its argument. This statute provides that vexatious-refusal damages are available "in addition to the amount" of the insurance claim, "and the court shall enter judgment for the aggregate sum found in the verdict." *Id.* Factoring in *Dhyne* and *DeWitt*, we think the statute means only that vexatious-refusal damages are recoverable over and above the damages for the underlying breach of contract, not that vexatious-refusal damages are recoverable only when there is a simultaneous surviving claim for breach of contract.

AmGuard also relies on numerous cases decided by the Missouri Court of Appeals. None of these cases deals with the precise issue here. *See Jones v. Prudential Ins. Co. of Am.*, 155 S.W. 1106, 1110–11 (Mo. Ct. App. 1913) (affirming an award notwithstanding the jury's failure to specify which part was for vexatious refusal and attorney's fees); *State ex rel. U.S. Fid. & Guar. Co. v. Walsh*, 540 S.W.2d 137, 141 (Mo. Ct. App. 1976) (en banc) (disallowing a claim for vexatious refusal against a surety when the principal had already paid a judgment on the underlying claim); *Hartwell v. Am. Fid. Assurance Co.*, 650 S.W.3d 320, 324 (Mo. Ct. App. 2022) (holding that a vexatious-refusal claim could not survive when the insurer obtained summary judgment on the breach-of-contract claim); *Fischer v. First Am. Title Ins. Co.*, 388 S.W.3d 181, 191–92 (Mo. Ct. App. 2012) (holding that there was no vexatious refusal to defend because there was no duty to defend); *Smith v. Piper*, 423 S.W.2d 22, 27 (Mo. Ct. App. 1967) (holding that there could be no punitive damages award against two defendants because there was no liability for actual damages, nor against two other defendants because the underlying claim was for breach of contract).

-8-

In *Walsh*, the Missouri Court of Appeals found persuasive the rationale raised here; namely, that the statutory phrases "in addition to" and "aggregate sum" require an award for breach of contract to support an award of vexatious-refusal damages. 540 S.W.2d at 141–42 (internal quotation marks omitted). But *Walsh* deals with whether a subcontractor can prevail on claims against a surety for payment for labor and materials, as well as vexatious delay, when the subcontractor's judgment against the principal for the value of the labor and materials has already been satisfied. *Id.* at 138–39. And in *Hartwell*, the court stated that "a claim for vexatious refusal to pay is only available when a breach of contract has been established," but it did so in the context of affirming summary judgment for the insurer on the issue of liability. 650 S.W.3d at 324. None of the Missouri Court of Appeals precedents that AmGuard raises persuade us that the Supreme Court of Missouri would hold that a claim for vexatious refusal must fail when the insured and insurer have completed the appraisal process or settled the underlying claim for breach of contract. *See Turntine*, 959 F.3d at 883–85 (declining to apply a rule approved by the Missouri Court of Appeals after determining that the Missouri Supreme Court would not follow that rule).

In its reply brief, AmGuard clarifies that its argument is only that there must be "a breach of contract or a refusal to pay," not that there must be a judgment on that breach of contract. Reply Br. at 4. Regardless, there is ample evidence that AmGuard breached the contract by failing to pay Academy even the undisputed portion of the claim for over a year and a half. On March 4, 2021, Academy formally demanded payment of the balance of the mortgage. Even assuming that March 4 was the first time Academy had made "due demand" for payment under § 375.296,[5] AmGuard had only 30 days from March 4 to pay Academy's claim, or else AmGuard would risk liability for vexatious refusal. AmGuard paid nothing until July.

---

[5]AmGuard has not pointed to any terms in the policy requiring Academy to do anything to obtain payment. Once AmGuard denied Shri's claim, the policy itself, and its requirements, applied directly to Academy. But AmGuard did not inform Academy of its denial until May 2020, seven months after both the fire and Chavers's report noting the existence of a mortgage.

AmGuard points out that Academy demanded the entire loan balance. But AmGuard could have paid at least the undisputed portion of the claim—Chavers had estimated the actual cash value of Shri's loss at about $135,000 in October 2019. Because AmGuard refused to pay within 30 days, the jury was authorized to award damages if AmGuard's "refusal was vexatious and without reasonable cause." Mo. Rev. Stat. § 375.296. In considering this question, the jury was entitled to look at the totality of the circumstances—including AmGuard's pre-demand conduct. *See Dhyne*, 188 S.W.3d at 458 ("[T]he jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." (internal quotation marks omitted)). Here, the policy required AmGuard to pay Academy's claim even if AmGuard denied Shri's claim. The jury reasonably concluded that AmGuard's failure to inform Academy of any requirements for payment and AmGuard's year-and-a-half delay constituted vexatious refusal.

Finally, AmGuard relies on *Olga Despotis Trust v. Cincinnati Insurance Co.*, No. 4:12-CV-2369-RLW, 2016 WL 831933 (E.D. Mo. Feb. 29, 2016), *aff'd*, 867 F.3d 1054 (8th Cir. 2017). In *Olga Despotis*, the district court granted summary judgment to the insurer on the insured's claims for breach of contract and vexatious refusal. *Id.* at *4–5. Two months after the insured's submission of proof of loss, the insurer had paid the insured about $800,000, the undisputed portion of the actual cash value, and then invoked the appraisal process. *Id.* at *1. The insured refused to participate in the appraisal until ordered by the court. *Id.* After the appraisal, the insurer paid $256,000, the unpaid amount of the actual cash value as determined by the appraisers. *Olga Despotis*, 867 F.3d at 1058. The court granted summary judgment to the insurer, holding "that the [insured] cannot maintain a claim for vexatious refusal to pay based upon the time when the parties were still engaged in the appraisal process." *Olga Despotis*, 2016 WL 831933, at *5.

*Olga Despotis* is distinguishable. In that case, the insurer paid the undisputed portion of the actual cash value two months after receiving proof of loss and then invoked the appraisal process. Here, AmGuard waited over a year and a half to pay

anything on Academy's claim, even though its liability was undisputed. *Olga Despotis* does not say that an appraisal process cures all pre-appraisal vexatious conduct. In fact, in affirming the district court's decision in *Olga Despotis*, we noted that the insurance policy's appraisal provision did not "abridge the insured's potential rights under Missouri's vexatious refusal statute" because "[t]he existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *Olga Despotis*, 867 F.3d at 1060–61 (alteration in original) (quoting *DeWitt*, 667 S.W.2d at 710). AmGuard's eventual payment after the appraisal process did not cure its pre-appraisal vexatious delay.

Thus, the district court did not err in denying AmGuard's motion for judgment as a matter of law.

## 2. *Exclusion of Evidence*

AmGuard seeks, in the alternative, a new trial on Academy's vexatious-refusal claim. AmGuard contends that the district court's exclusion of evidence hampered its defense. Specifically, AmGuard argues that the district court abused its discretion by (1) prohibiting AmGuard from characterizing the appraisal award as an agreed amount, as opposed to a compromise; (2) requiring AmGuard to characterize the appraisal award as a payment on the loan; (3) prohibiting AmGuard from presenting evidence of the amount, timing, and reasons for AmGuard's pre-appraisal payments; and (4) preventing AmGuard from showing that it "paid what it was contractually obligated to pay under [the appraisal] procedure that *Academy* elected." Appellant's Br. at 32.

We generally review the district court's exclusion of evidence for an abuse of discretion. *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 467 (8th Cir. 2000). When a party does not object to the district court's ruling, we review only for plain error. *Id.*

-11-

First, the district court did not abuse its discretion in prohibiting AmGuard from characterizing the appraisal award as an agreed amount.[6] Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." "[W]e owe great deference to the court's balancing of the relative value and prejudicial effect of evidence . . . ." *Trotter v. Lawson*, 997 F.3d 819, 821 (8th Cir. 2021) (internal quotation marks omitted). The court understandably sought to prevent the jury from measuring Shri's damages by the appraisal award. Characterizing the appraisal award as a compromise, rather than an agreement or stipulation, did not unfairly prejudice AmGuard.

Second, the district court did not plainly err by requiring AmGuard to characterize the appraisal payment to Academy as a payment on the loan. AmGuard does not point to any part of the record showing that it objected to this requirement. When the court decided to admit evidence of the total amount of the appraisal award, the following exchange occurred:

> [THE COURT:] [T]o make myself clear, there should be absolutely no testimony, argument, or otherwise connecting this to a payment on the fire damage. Is that understood?
>
> [AMGUARD]: It's understood.

R. Doc. 225, at 83. AmGuard characterizes this exchange as "AmGuard's acquiescence to the Court's explicit ruling over counsel's argument." Reply Br. at 12. AmGuard acquiesced to the court's ruling, but this ruling was not over *AmGuard's* objection. Rather, the court's statement appeared in the context of a ruling—over *Shri's* objection—admitting evidence of the appraisal award's total amount. The court went on to state that it would instruct the jury to consider that amount only in reference to Academy's claims. AmGuard did not object. Thus, we

---

[6]We assume without deciding that AmGuard preserved an objection to this evidentiary ruling, and we review for abuse of discretion.

review only for plain error. *See DiCarlo*, 211 F.3d at 467. "Plain error is a stringently limited standard of review, especially in the civil context, and must result in a miscarriage of justice in order to compel reversal." *Riggs v. Gibbs*, 66 F.4th 716, 719 (8th Cir. 2023) (quoting *Bady v. Murphy-Kjos*, 628 F.3d 1000, 1003 (8th Cir. 2011)). AmGuard has not shown a miscarriage of justice. To avoid prejudicing Shri, the court tried to prevent the jury from measuring Shri's damages by the appraisal award. The court did not plainly err.

Third, AmGuard has not shown that it ever sought to admit evidence of the amount, timing, and rationale behind each of its payments to Academy. Prior to trial, Shri moved to exclude evidence of the amount of the appraisal award. Before opening statements, the district court stated, "[L]et's continue to think through this, and please make no mention of it during either your jury selection or opening statements until . . . I make a final decision on it." R. Doc. 225, at 15. During opening statements, Academy mentioned the first payment as a percentage and "very small amount" of the final amount. *Id.* at 31. AmGuard then sought permission to state the amount of that first payment. In keeping with its earlier ruling limiting opening statements, the court denied permission. But AmGuard does not point to any ruling of the court prohibiting AmGuard from presenting *evidence* about the breakdown of these payments. *See United States v. Hernandez*, 779 F.2d 456, 458 (8th Cir. 1985) ("[S]tatements and arguments of counsel are not evidence in the case . . . ." (internal quotation marks omitted)). In fact, the *timing* of the payments was introduced into evidence.[7] The court's pre-trial ruling expressly applied only to jury selection and opening statements and was not a final decision on the admission of evidence. AmGuard has shown no miscarriage of justice and no plain error. *See generally First Union Nat'l Bank ex rel. Se. Timber Leasing Statutory Tr. v. Pictet Overseas Tr. Corp.*, 351 F.3d 810, 816 (8th Cir. 2003) ("[W]e do not normally consider issues which the district court did not rule upon . . . ."); *United States v. Lewis*, 557 F.3d 601, 611 n.2 (8th Cir. 2009) ("[B]ecause the agent was not called as a witness and

---

[7]Additionally, counsel for Academy mentioned the amount of the payments in closing argument.

the statement was not offered at trial, the district court never ruled on the statement's admissibility. We therefore cannot say that the joint trial denied [the defendant] the opportunity to present the statement he gave to the FBI agent.").

Finally, AmGuard also argues that the court prevented it

> from showing that it acted reasonably . . . in making payments, that during the appraisal process Academy's experts agreed that its damages were not the exceedingly high value it had been claiming . . . and that AmGuard, in fact, paid what it was contractually obligated to pay under this procedure that *Academy* elected.

Appellant's Br. at 32. To the extent that AmGuard intends to challenge additional rulings of the district court, it does not point to any specific rulings in the record, and we decline to select any other for review. *See First Union Nat'l Bank*, 351 F.3d at 816. The district court did not abuse its discretion in declining to grant AmGuard a new trial on Academy's vexatious-refusal claim.

## B. *Shri's Breach-of-Contract Claim*

AmGuard also seeks a new trial on Shri's breach-of-contract claim. AmGuard argues that the district court abused its discretion by excluding Lizar's testimony, excluding part of Patel's deposition testimony, and failing to instruct the jury that it could draw an adverse inference from Patel's invocation of the Fifth Amendment. AmGuard contends that the cumulative effect of these errors substantially influenced the verdict.

### 1. *Exclusion of Lizar's Testimony*

AmGuard argues that the district court abused its discretion by refusing to admit Lizar's testimony.

Before the fire, an anonymous caller informed the fire department that there would be a fire at the Days Inn and that it would start in the attic or on the second floor. According to the fire marshal who took the call, the caller said that she had

overheard the owner and another man talking about starting a fire. When AmGuard made its initial disclosures under Federal Rule of Civil Procedure 26, the caller's identity was unknown, but AmGuard disclosed the existence of the call. In a January 2022 deposition, fire investigator Chad Hildebrand identified the caller as Lizar and informed the parties that he had interviewed Lizar. Hildebrand stated that Lizar said that she had received information from Samantha Walter that Patel had planned the fire. Lizar had reported that "she had heard them talking about they were going to burn the hotel." R. Doc. 160-3, at 13.

Prior to trial, Shri moved to exclude Lizar's testimony, arguing that AmGuard had never properly disclosed Lizar under Rule 26. The district court denied that motion, stating that "[t]here [wa]s no indication that [AmGuard] ha[d] any more information (such as [Lizar's] address) to provide." *Shri Ganesai, LLC v. AmGuard Ins. Co.*, No. 21-00355-CV-W-BP, 2022 WL 5082045, at *2 (W.D. Mo. July 12, 2022). The court further noted that its order was not "intended to address (1) [AmGuard's] obligations should it obtain more information about [this] witness[], [or] (2) whether the Court w[ould] reopen discovery or permit the witness[] to testify if . . . found." *Id.*

Neither party deposed Lizar. But on August 30, 2022, AmGuard served Lizar with a subpoena at her boyfriend's home. AmGuard still did not have Lizar's phone number and did not provide Shri with Lizar's boyfriend's address. On Friday, September 9, AmGuard filed a return of service. The trial was scheduled to begin the following Monday. On Monday, Lizar came to court. AmGuard did not inform the plaintiffs of her presence. On Tuesday afternoon, AmGuard informed the court that Lizar had been present the previous day. On Wednesday, AmGuard offered to let counsel for Shri speak with Lizar in the morning before AmGuard called her to testify in the afternoon. Ultimately, the court declined to admit Lizar's testimony, stating that AmGuard's failure to inform the plaintiffs of Lizar's presence in court "created an unfair surprise." R. Doc. 227, at 11.

AmGuard proffered Lizar's testimony. When asked whether she knew Alex Patel, Lizar said "[n]o," but she identified Patel in court as the hotel's owner. *Id.* at 30. Lizar said that, before the fire, she overheard Patel tell Walter "that there was going to be a fire at Days Inn." *Id.* at 31. Notably, she gave as her address the same address listed on the return of service—an address known to AmGuard no later than August 29 but not disclosed until the return of service was filed on September 9.

On appeal, AmGuard argues that Shri would not have been unfairly surprised by Lizar's testimony because AmGuard followed the discovery rules and because the parties knew how Lizar would testify.

Under Rule 26(a)(3)(A)(i), a party must disclose "the name and, if not previously provided, the address and telephone number of each witness" it plans to call at trial. The party must make these disclosures "at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B). Furthermore, under Rule 26(e)(1)(A),

> [a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response
>
>> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . .

The penalty for noncompliance can be severe:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

-16-

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1). Under this rule, "[t]he district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). "[T]he district court has wide discretion to fashion a remedy or sanction" for a failure to disclose information under Rule 26(e). *Id.* Yet "the district court's discretion narrows as the severity of the sanction or remedy it elects increases." *Id.* "[T]he exclusion of evidence is a harsh penalty and should be used sparingly . . . ." *Id.* (quoting *ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186, 190 (8th Cir. 1995)). In imposing a sanction under Rule 37(c), a district court should consider a variety of factors, including "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony," *id.*, and may consider as well "whether a continuance would effectively cure the prejudice," *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 405 (8th Cir. 2013).[8]

---

[8]We have reversed a directed verdict and held that a district court should have permitted the plaintiff to call the defendant as a witness, notwithstanding the plaintiff's failure to include the defendant on her witness list. *Morfeld v. Kehm*, 803 F.2d 1452, 1453, 1456 (8th Cir. 1986). The rules at issue were Federal Rule of Civil Procedure 16(e) and (f) and a local rule, rather than Rule 37. *Id.* at 1455. We said that "[t]he rule should be applied flexibly and pragmatically and should seldom be used to bar a party's use of a witness not disclosed unless bad faith is involved." *Id.* at 1456; *see also Dabney v. Montgomery Ward & Co.*, 692 F.2d 49, 50, 53 (8th Cir. 1982) (reversing because the district court abused its discretion in excluding the testimony of a fact witness discovered the morning of trial). Notably, we decided *Morfeld* and *Dabney* before Rule 37(c) was amended to "provide[] a self-executing sanction." Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment.

AmGuard had an address for Lizar as of August 29. AmGuard may not have known that Lizar was living at that address, but it served Lizar with a subpoena at that address on August 30. Additionally, Lizar later claimed that address as her own. AmGuard had never disclosed a phone number or address for Lizar under Rule 26(a) because it lacked that information. But it had a duty to supplement its Rule 26(a) disclosures when it learned additional information that should have been disclosed. Lizar's boyfriend's address—where Lizar was found—was such information.

AmGuard's failure to disclose this information was not substantially justified nor harmless. AmGuard knew that the plaintiffs had not deposed Lizar and yet did not inform them that Lizar had been found. AmGuard waited ten days to file a return of service. By its own admission, AmGuard believed Lizar was transient—meaning the plaintiffs may not have been able to interview her even if they saw the return of service and visited the listed address the weekend before trial—but AmGuard still did not tell the plaintiffs that Lizar was in court on the first day of trial, which could have given the plaintiffs the opportunity to speak with her and prepare to cross-examine her. AmGuard only offered the plaintiffs the chance to speak with Lizar in the morning and be prepared for cross-examination in the afternoon. AmGuard's failure to timely inform the plaintiffs of Lizar's contact information—or at least her presence in court—was not substantially justified.

Furthermore, the failure was not harmless. AmGuard argues that Shri would not have been surprised by Lizar's testimony because it knew that she was the anonymous caller and that she would implicate Patel. In his deposition, Hildebrand said that Lizar had implicated Patel in the alleged arson. But he also said that Lizar "had heard *them* talking about they were going to burn the hotel." R. Doc. 160-3, at 13 (emphasis added). The fire marshal said that the anonymous caller reported overhearing the owner and another man talking about the fire, whereas Hildebrand said that Lizar reported getting information from Walter. Before trial, the parties had

Nevertheless, exclusion "should be used sparingly." *Wegener*, 527 F.3d at 692 (quoting *ELCA Enters.*, 53 F.3d at 190).

only second-hand statements from Lizar, and the statements did not seem entirely consistent. During Lizar's proffer at trial, she answered "[n]o" when asked whether she knew Patel, but then she identified Patel as the hotel's owner. R. Doc. 227, at 30. Thus, until Lizar's proffer at trial, it was not entirely clear that Lizar would testify that she had heard Patel talking about a fire. And if she had not heard Patel *himself* talking about the fire, her testimony implicating Patel likely would have been excludable as hearsay. Thus, AmGuard's failure to disclose Lizar's contact information, which limited Shri's opportunity to speak with Lizar and prepare for cross-examination, was not harmless.

For the same reasons, the district court did not abuse its discretion in determining that admitting Lizar's testimony would constitute unfair surprise. And other factors do not overcome this determination. AmGuard has offered no compelling "reason for noncompliance." *Wegener*, 527 F.3d at 692. Lizar's testimony may not have been disruptive to the trial, but the matter arose mid-trial, so a lengthy continuance was impractical. Although Lizar's testimony directly implicated Patel and so was important to AmGuard's defense, this importance did not require the court to admit the testimony given the court's finding of unfair surprise.

AmGuard relies on *McClendon v. United States*, 587 F.2d 384 (8th Cir. 1978). In *McClendon*, we affirmed a conviction when the district court had admitted the testimony of witnesses whom the government did not disclose. *Id.* at 387–89. *McClendon* is distinguishable. We based our decision on the lack of prejudice to the defendant, noting that "an error in administering the discovery rules is not reversible unless shown to be prejudicial to the substantial rights of the defendant." *Id.* at 388 (cleaned up). Furthermore, *McClendon* deals with Federal Rule of Criminal Procedure 12.1, which provides that exclusion as a sanction is permissive. By contrast, Rule 37(c) makes exclusion "self-executing" unless non-compliance "is substantially justified or harmless." *Wegener*, 527 F.3d at 692.

Additionally, a "district court has wide discretion" under Rule 37(c). *Id.* We affirmed in *McClendon*, *Wegener*, and *Carmody*. Here, AmGuard seeks reversal. "The abuse-of-discretion standard means 'the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, 920 F.3d 1203, 1206 (8th Cir. 2019) (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013)). Indeed, "[t]he very concept of discretion presupposes a zone of choice within which the trial courts may go either way." *Id.* (quoting *Novus Franchising*, 725 F.3d at 895–96). Regardless of whether the district court might reasonably have exercised its discretion to permit Lizar's testimony, it did not abuse its discretion in disallowing her testimony. It acted within its zone of choice.

### 2. *Patel's Invocation of the Fifth Amendment*

AmGuard next argues that the district court abused its discretion by refusing to admit Patel's entire deposition. Specifically, AmGuard contends that it should have been permitted to introduce Patel's invocation of the Fifth Amendment in response to questions about his finances, other people who were involved in setting the fire or present at the scene, "whether he provided the propane torch and gasoline found in the attic[,] and whether he silenced the fire alarm." Appellant's Br. at 43.

The district court permitted AmGuard to read into evidence seven questions from Patel's deposition and Patel's invocation of the Fifth Amendment in response to those questions. Those questions covered whether Patel was involved in setting the fire, disabled the security cameras, called 911, and was truthful with AmGuard and the fire marshal during the investigation. The court declined to admit the remaining questions and answers because it determined that AmGuard had not presented other evidence on those topics. But the court invited the parties to make a record after reviewing the court's selected questions and answers. AmGuard never did so.

We review the district court's exclusion of evidence for an abuse of discretion. *DiCarlo*, 211 F.3d at 467. "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ." Fed. R. Evid. 103(a).

"[A]n adverse inference may be drawn against a party who invokes the Fifth Amendment privilege and refuses to testify in a civil proceeding . . . ." *Koester v. Am. Republic Invs., Inc.*, 11 F.3d 818, 823–24 (8th Cir. 1993) (reversing a punitive damages award unsupported by any evidence except the party's invocation of the Fifth Amendment). This rule presupposes that the factfinder may be informed of the party's invocation of the Fifth Amendment. Furthermore, we have approved the admission of even a *non-party's* invocation of the privilege against self-incrimination after considering the non-party's relationship to the plaintiff, whether admitting the evidence "made the invocation too costly," the balancing required by Federal Rule of Evidence 403, and, most relevant here, the importance of the non-party's potential testimony. *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471, 1481–82 (8th Cir. 1987) ("If anyone knew whether there was an intent to commit a fraud, it was [this witness]. Hearing [this witness] invoke the privilege informed the jury why the parties with the burden of proof, i.e., the insurance companies, resorted to less direct and more circumstantial evidence than [this witness's] own account of what had occurred."). Here, the district court limited the admission of Patel's invocations of the Fifth Amendment to only those topics on which AmGuard had presented additional evidence. The court held that AmGuard was not prejudiced by Patel's silence on other topics, so the court did not admit his other invocations.

We need not decide whether AmGuard preserved an objection, nor whether the district court should have admitted Patel's entire deposition, because any error did not affect AmGuard's substantial rights. *See* Fed. R. Evid. 103(a). In addition to five other invocations of the Fifth Amendment, the jury heard the following exchange from the deposition:

-21-

Q. Were you involved in the burning of the Days Inn hotel October 2, 2019?

A. I'm asserting my Fifth Amendment right to remain silent.

. . . .

Q. Did you start the fire at the hotel on October 2, 2019?

A. I'm asserting my Fifth Amendment right to remain silent.

R. Doc. 228, at 32–33. If the jury did not conclude from this exchange—and the five additional invocations—that Patel had something to do with setting the fire, we fail to see how the rest of the deposition would have convinced the jury of Patel's complicity. And the jury could infer from those seven invocations that any attempt by AmGuard to get information from Patel about other topics would have been futile. AmGuard has not shown prejudice to its substantial rights.

### 3. *Adverse-Inference Instruction*

AmGuard also argues that the district court should have instructed the jury that it could draw an adverse inference from Patel's invocation of the Fifth Amendment. AmGuard proposed an adverse-inference instruction. The court refused to so instruct the jury, stating, "I think that coming from the Court, it has the potential to put an undue weight on that particular instruction, and I think that having it in the jury room for them to constantly go back and review has a potential of putting undue weight." R. Doc. 228, at 22. AmGuard did not object to the court's refusal. The court allowed AmGuard to argue for an adverse inference in closing argument. AmGuard did so. Shri then argued that the jury should follow the court's instructions and pointed out that the court had not instructed the jury to draw an adverse inference. AmGuard did not object. After the jury retired to deliberate, AmGuard asked the court to give an adverse-inference instruction in light of Shri's argument. The court refused.

We review the district court's refusal of an offered jury instruction for an abuse of discretion. *Davis v. White*, 858 F.3d 1155, 1160 (8th Cir. 2017).[9] "The district court has broad discretion in submitting instructions to the jury . . . ." *Fox v. Dannenberg*, 906 F.2d 1253, 1258 (8th Cir. 1990). "In diversity cases the substance of jury instructions is a matter governed by the applicable state law. Accordingly, the jury instructions, when read as a whole, must fairly and adequately present the relevant state law." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 711 (8th Cir. 2001) (cleaned up). "Even correct statements of the law can mislead the jury if they unduly emphasize a matter favorable to a party's case." *Kelley as Tr. For PCI Liquidating Tr. v. Boosalis*, 974 F.3d 884, 897 (8th Cir. 2020).

In Missouri, a civil jury *may* draw an adverse inference against a defendant who invokes the Fifth Amendment. *Allen v. Bryers*, 512 S.W.3d 17, 36 (Mo. 2016)

---

[9]Shri argues that AmGuard did not preserve this argument. Federal Rule of Civil Procedure 51(d)(1)(B) provides that "[a] party may assign as error . . . a failure to give an instruction, if that party properly requested it and—*unless the court rejected the request in a definitive ruling on the record*—also properly objected." (emphasis added). We have rejected a similar contention that a party did not preserve its argument as to a requested instruction. *See Lasley v. Running Supply, Inc.*, 670 F. App'x 910, 912 n.2 (8th Cir. 2016) (unpublished per curiam). We note that Shri primarily relies on (1) cases discussing the preservation of an objection to an instruction actually given and (2) cases decided before Rule 51 was amended to relax the requirements for preserving error as to a refused instruction. *See* Fed. R. Civ. P. 51 advisory committee's note to 2003 amendment ("Subdivision (d)(1)(B) establishes authority to review the failure to grant a timely request, despite a failure to add an objection, when the court has made a definitive ruling on the record rejecting the request."). We note, however, that the district court told counsel for AmGuard, "Just for purposes of the record . . . you seem to be nodding agreement with me. Just in case the Eighth Circuit would like to know your position. You can exercise your Fifth Amendment right on this." R. Doc. 228, at 22. AmGuard thereafter argued objections to other instructions, but not to the court's failure to give an adverse-inference instruction. We need not decide whether AmGuard preserved an objection, as the outcome would be the same under plain-error review.

(en banc); *J.C.M. v. J.K.M.*, 573 S.W.3d 672, 686 (Mo. Ct. App. 2019). Some Missouri precedent suggests that a *plaintiff* who invokes the privilege as to relevant information—and persists in this invocation—is not entitled to relief at all. *See Geldback Transp., Inc. v. Delay*, 443 S.W.2d 120, 121 (Mo. 1969) (per curiam); *In re Marriage of Fellers*, 789 S.W.2d 153, 155–57 (Mo. Ct. App. 1990); *Williams v. Gary Breedlove Constr., Co.*, 950 S.W.2d 557, 561–62 (Mo. Ct. App. 1997). But AmGuard asked for an instruction on a permissive inference. On appeal, AmGuard argues only that it was entitled to a permissive inference. Thus, we will assume without deciding that, under Missouri law, a jury *may*, but is not required to, infer that a plaintiff's answers would have been adverse when the plaintiff has invoked the Fifth Amendment.

Although Missouri law is clear that the factfinder *may* draw an adverse inference against a defendant, AmGuard has pointed us to no case suggesting that a court *must* give an adverse-inference instruction. In a similar case, though, the Missouri Court of Appeals rejected a challenge to a permissive adverse-inference instruction. *J.C.M.*, 573 S.W.3d at 686. In *J.C.M.*, the plaintiff argued that the instruction was necessary to clarify the law after the defendant misled the jury during voir dire. *Id.* at 685–86. The defendant argued only that the instruction misstated the law. *Id.* at 685–86, 686 n.11. The court held that the instruction correctly stated the law permitting an adverse inference. *Id.* at 686. But the court stated, "Because of the narrow basis of [the defendant's] objection, we need not determine whether a misstatement of the law during *voir dire* would justify the use of an adverse-inference instruction. In general, *a trial court should refuse such a request*." *Id.* at 686 n.11 (second emphasis added).

Similarly, AmGuard argues that the district court should have given the instruction because Shri improperly argued to the jury that it should not draw an adverse inference. But a key distinction between this case and *J.C.M.* is the timing of the alleged impropriety. In *J.C.M.*, the allegedly improper question occurred during voir dire, well *before* the jury instructions. Here, the allegedly improper argument occurred *after* the court instructed the jury, and AmGuard did not timely

renew its request for an instruction. The court could not anticipate Shri's argument, nor was the court required to raise sua sponte the issue of an adverse-inference instruction after closing arguments. Shri's later argument does not turn the court's earlier ruling into an abuse of discretion. And notably, the court in *J.C.M.* never decided whether an improper argument could necessitate an adverse-inference instruction. In fact, the court voiced general disapproval of such instructions.

The district court rejected the proposed instruction because of concern that it would unduly focus the jury's attention on the issue. *See Kelley*, 974 F.3d at 897. The court did, however, permit AmGuard to argue the inference. On this record, we hold that the court did not abuse its discretion.

### 4. *Summary*

The district court did not abuse its discretion in declining to admit Lizar's testimony or refusing to instruct the jury on an adverse inference from Patel's Fifth Amendment shield. And the court's limitation on the admission of Patel's deposition did not affect AmGuard's substantial rights. Therefore, the court did not abuse its discretion in denying AmGuard a new trial on Shri's breach-of-contract claim.

### C. *Vandalism and Freeze-Damage Claims*

AmGuard argues that it is entitled to judgment as a matter of law, or at least a new trial, on Academy's and Shri's claims for damage caused by vandalism and frozen pipes. AmGuard argues that the plaintiffs failed to present evidence that all the damage occurred during the coverage period and that the cost of the damage "exceed[ed] the [p]olicy's deductible of $5,000 per occurrence." Appellant's Br. at 50. AmGuard also argues that the court improperly admitted Anderson's expert testimony.

### 1. *Timing of the Damages*

The plaintiffs rely on Cox's testimony to support their claim for damages from vandalism and frozen pipes. AmGuard argues that "Cox did not give an opinion on the timing of any damages and instead relied on the opinions of other experts to

come to his conclusions." Reply Br. at 29. But counsel for AmGuard, while objecting to certain materials included in Cox's expert report, said that "[Cox's] opinions, on the last page, are all having to do with just repair cost and the [actual cash value]." R. Doc. 226, at 172. AmGuard's counsel went on to say, "I'm happy to stipulate to the admissibility of his actual opinions." *Id.* at 173. On direct examination, the plaintiffs asked Cox about those very opinions that AmGuard had *stipulated* were admissible:

> Q. And these are a variety of opinions that you gave with respect to replacement cost value and actual cash values for different types of damage at the property; is that correct?
>
> A. Correct.
>
> Q. And I wanted to ask you specifically . . . there's a replacement cost value for the cost to repair the vandalism damage to the subject property sustained between October 15, 2019, and January 10, 2020, as of July 23, 2021, was $86,672.04, due to changes in material and labor costs since February 14, 2020. Was that your opinion?
>
> A. That is correct.
>
> Q. Does that remain your opinion with respect to those time frames and dollar amount?
>
> A. It does.
>
> Q. . . . Did you do an actual cash value analysis on the replacement cost value of the vandalism damage?
>
> A. Yes, we did.
>
> Q. All right. And I see . . . it states, "The actual cash value for the cost to repair the vandalism damage to the subject property sustained between October 15, 2019, and January 10, 2020, as of July 23, 2021, was $86,640.35, due to changes in material and labor costs and additional vandalism discovered since February 14, 2020." Was that your opinion?

-26-

A. That's correct.

Q. Does that remain your opinion today?

A. Yes, it does.

*Id.* at 235–36. Likewise, Cox's report stated his opinion that the freeze damage from the same period resulted in over $407,000 in damages, and he confirmed this on direct examination.

"We will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." *Wedow*, 442 F.3d at 669 (internal quotation marks omitted). Furthermore, a party who stipulates to the admission of evidence waives any right to challenge its admissibility. *See United States v. Hawkins*, 215 F.3d 858, 860 (8th Cir. 2000).

The policy's coverage period expired on January 10, 2020. Cox testified as to the actual cash value and replacement cost value for damages "*sustained between October 15, 2019, and January 10, 2020*." R. Doc. 226, at 235–36 (emphasis added). Thus, the jury heard, without objection, that, as of January 10, the plaintiffs had sustained damages of over $86,000 from vandalism and over $407,000 from frozen pipes. AmGuard stipulated to the admission of Cox's opinion and cannot now complain that the opinion was baseless. *See Hawkins*, 215 F.3d at 860.

AmGuard also argues that Cox included damage from after the policy period in his estimate. But Cox said he included damage *discovered* after February 14, 2020, not damage *incurred* after February 14. His unobjected-to opinion was that the damage occurred between October 15 and January 10.

The evidence sufficiently supports a finding that the freeze and vandalism damages occurred during the policy period.

## 2. *Single Occurrence*

AmGuard also argues that the plaintiffs failed to prove that the vandalism damage and the freeze damage each resulted from a single occurrence. Because the policy contained a per-occurrence deductible of $5,000, if the damages resulted from multiple occurrences, the damage from each separate occurrence would be subject to a separate deductible, reducing AmGuard's liability.

Section I of the policy, which outlines property coverage, does not define "occurrence." Interestingly, Section II of the policy, which outlines liability coverage, defines "occurrence" as "an accident, including *continuous or repeated exposure to substantially the same general harmful conditions*." J.A. at 6884 (emphasis added). Applying this definition, in the absence of a more specific definition in the property section of the policy, the jury could reasonably conclude that gradual cooling of the pipes as winter set in and the eventual bursting of those pipes constituted a single "occurrence," even if the damage was spread over multiple days.

Likewise, the jury could reasonably conclude that there was only one occurrence of vandalism. Ammerman testified that he understood that vandalism had been reported to the police on December 19, 2019, and there was no evidence of any other police report. Cherry's claim notes suggest that there was an occurrence of vandalism on January 20, 2020. But in finding that the damage occurred during the policy period, the jury rejected this date, as it was free to do. *See Wellshear v. Brown*, 231 F.2d 612, 613 (8th Cir. 1956) ("We must assume that all conflicts in the evidence were resolved by the jury in favor of the plaintiff . . . .").

There was sufficient evidence that the freeze damage and the vandalism damage were each subject to only one deductible amount.

### 3. *Expert Testimony of Tim Anderson*

AmGuard also argues that Tim Anderson, who testified over AmGuard's objection, based his opinion on assumptions and was not qualified to testify as an expert on the cause of freeze damage.

We review the district court's admission of expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). At the time of trial, Federal Rule of Evidence 702 provided:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011) (amended 2023).[10] This rule relaxed the requirements for expert witnesses, though the Supreme Court has held that courts still have a gatekeeping role to assure that evidence admitted is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–89, 597 (1993).

---

[10]Federal Rule of Evidence 702 has since been amended. We apply precedents interpreting the *prior version* of the rule and do not decide whether our holding here would be the same if the amendments had been in effect at trial. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 291–92 (1994) (Scalia, J., concurring) (opining that new rules of evidence should not be applied retroactively).

We have framed the *Daubert* inquiry as "a three-part test":

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 561 (8th Cir. 2014) (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)). The *Daubert* factors include

> (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the known rate of error for the technique or theory and the applicable standards for operation; and (4) whether the technique is generally accepted.

*Id.* at 562. These factors may also apply to non-scientific expert testimony. *Kumho Tire*, 526 U.S. at 151. A district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152. But generally, *Daubert* "call[s] for the liberal admission of expert testimony." *Johnson*, 754 F.3d at 562. And "[a]s long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross[-]examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590).

Here, the district court did not abuse its discretion in admitting Anderson's testimony. The testimony was useful for determining when the damage occurred. Experience itself can be a sufficient basis for expert testimony; the witness need not

be a scientist. *See* Fed. R. Evid. 702. Anderson's years of experience repairing damage that appeared to result from frozen pipes, combined with his examination of temperature records, supplied a sufficient basis for his testimony about the probability that the pipes froze during the policy period.

AmGuard complains that Anderson did not account for windchill, the amount of water, the amount of pressure, and other factors. We have noted, though, that "a differential expert opinion can be reliable even with less than full information. Instead, such considerations go to the weight to be given the testimony by the factfinder, not its admissibility." *Johnson*, 754 F.3d at 564 (cleaned up). Similarly, here any failure to take account of windchill, pressure, and the amount of water merely provided material for cross-examination or opposing expert testimony. The court did not abuse its discretion in admitting Anderson's testimony.

## 4. *Summary*

Sufficient evidence supports the jury's findings that the vandalism damage and the freeze damage each resulted from a single occurrence during the policy period. And the district court did not abuse its discretion in admitting Anderson's expert testimony. Therefore, the court did not err in declining to enter judgment as a matter of law and did not abuse its discretion in declining to grant AmGuard a new trial on the claims for vandalism and freeze damage.

## III. *Conclusion*

The district court did not err in declining to grant AmGuard judgment as a matter of law on Academy's claim for vexatious refusal, Shri's claim for breach of contract, or both plaintiffs' claims for vandalism and freeze damage. And the court did not abuse its discretion in declining to grant a new trial on those claims. Accordingly, we affirm the judgment of the district court.

_____